**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

|  |  |  |
|---|---|---|
| **JF ACQUISITION, LLC,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Case No. _____** |
| **v.** | ) ) ) | **JF ACQUISITION, LLC'S COMPLAINT** |
| **SENECA COMPANIES, INC., OWL SERVICES, INC., and TRIVE CAPITAL MANAGEMENT, LLC,** | ) ) ) ) | **JURY DEMAND** **PUBLIC REDACTED VERSION** |
| **Defendants.** | ) ) ) ) | |

COMES NOW Plaintiff, JF Acquisition, LLC ("JF"), by and through counsel, and submits the following Complaint:

## NATURE OF THE ACTION

1.      Fuel dispensers are integral to the purchase and sale of gasoline and diesel fuel at retail gasoline stations and represent one of the most expensive fixed costs in which retail gasoline stations must invest.  Robust competition to distribute and service fuel dispensers at competitive prices is therefore essential to ensure that both retail gasoline stations and the consumers who purchase fuel receive high quality products and services at competitive prices.

2.      Over the past few years, Trive Capital Management, LLC ("Trive"), a Dallas-based private equity firm, has been consolidating the fuel dispenser distribution and servicing industry across the United States.  It started with Trive's creation of OWL Services, Inc. ("OWL Services"), which is a rollup of several fuel dispenser distribution, installation and service companies.

3.      On January 2, 2024, Trive added another significant competitor, Seneca

Companies, Inc. ("Seneca"), to its portfolio.  Before Trive's acquisition of Seneca, OWL Services and Seneca competed head-to-head for fuel dispenser distribution and servicing contracts, and other related services, particularly in the Midwest.

4.     Prior to its sale, Seneca marketed itself as a ████████████████████



████████████████████████████████████ It boasted about ███████████████

████████████████████████████████████████████████████████████████████

████████████████████

5.     Presumably to minimize coverage of the acquisition of Seneca, Trive broke from its historic practice and never publicly announced the deal.  And in a nod to the obvious competition concerns, OWL Services communicated internally ████████████████████

████████████████████████████.

6.     But the companies have not enforced—or even, it seems, implemented—this supposed ████████  Following the acquisition, Trive has ensured that Seneca and OWL Services have an interlocking directorate that affords each company access to the other's competitively sensitive information.  And leaders of all three companies ████████████████████

████████████████████████████████.

7.     Defendants' conduct goes beyond information sharing.  Following the acquisition, Defendants have engaged in exclusionary and predatory conduct aimed at cementing their now-combined market power and diminishing competition in the fuel dispenser distribution and servicing market in Iowa and Southern Illinois.

8.     The chief target of Defendants' anticompetitive measures in this market has been JF Acquisition, LLC, dba JF Petroleum Group and JF Construction Services ("JF"), the primary competitive threat to Defendants. After Gilbarco Veeder-Root Company ("Gilbarco"), one of the

nation's leading manufacturers of fuel dispensers, specifically requested that JF expand its operations—temporarily at first by sending an emergency response team to fill the gap left by Seneca in Iowa, and later to distribute its dispensers in Iowa and Southern Illinois—Defendants quickly moved to try to expel JF from what they considered "their" territory.

9.      Defendants have sought to exclude JF from the market by cutting it off from the customer, supplier, and employee relationships that are essential for JF to continue to service the Iowa and Southern Illinois market and throughout the United States.  First, Defendants have entered into an unlawful conspiracy—including each of the Defendants and Casey's General Stores ("Casey's"), one of JF's most significant customers nationally and the largest convenience store chain in the Midwest region—pursuant to which Casey's has agreed with Defendants that it will all but entirely boycott JF in Iowa and Southern Illinois.  Second, Defendants have engaged in a smear campaign against JF that has included misrepresentations to Gilbarco itself concerning JF's capacity to legally service the Iowa and Southern Illinois market.  And third, Defendants have entered into and aggressively enforced patently overbroad and unnecessary noncompete agreements to prevent Seneca's former employees from pursuing employment opportunities at JF.

10.      Defendants' anticompetitive conduct is aimed at excluding JF from the Iowa and Southern Illinois market and enhancing their own market power by impairing JF's ability to compete on the merits.  This is all in service of Trive's goal of converting its acquisitions of OWL and Seneca into a regional monopoly and becoming the region's only brand-agnostic provider of fuel dispenser distribution and servicing.

11.      Defendants' anticompetitive conduct has already caused JF to suffer irreparable harm to its reputation in the eyes of its customers, its key supplier, and the workforce, and it threatens JF's ability to distribute or service fuel dispensers in Iowa and Southern Illinois at all.  It

also sends a chilling message to would-be entrants that Defendants will engage in a coordinated, comprehensive campaign to exclude them from the market.

12.     Left unchecked, this conduct will deprive fuel dispenser customers in the region of meaningful and robust competition, and result in higher prices and reduced output.  And ultimately, the deprivation of meaningful competition in the market will also harm downstream consumers in the form of higher prices for fuel and other goods sold at gas station convenience stores.

13.     As a result, JF brings this action for damages and injunctive relief against Defendants for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1; Section 2 of the Sherman Act, 15 U.S.C. § 2; the Iowa Competition Law, Iowa Code § 553; and Iowa common law.

## PARTIES

14.     Plaintiff JF is a North Carolina limited liability company with its principal place of business at 100 Perimeter Park Drive, Suite H, Morrisville, North Carolina 27560.

15.     Defendant Seneca is an Iowa corporation with its principal place of business at 4140 East 14th Street, Des Moines, Iowa 50313.

16.     Defendant OWL Services is a Michigan corporation with its corporate headquarters at 888 W Big Beaver Road #200, Troy, Michigan 48084.

17.     Defendant Trive is a limited liability company with its principal place of business at 2021 McKinney Avenue Suite 1200, Dallas, Texas 75201.

## JURISDICTION AND VENUE

18.     JF brings this lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 2 of the Sherman Act, 15 U.S.C. § 2, the Iowa Competition Law, Iowa Code § 553, and Iowa common law to enjoin Defendants' anticompetitive conduct, to recover damages and the costs of suit including reasonable attorneys'

fees, and for such other relief as is afforded under the antitrust laws of the United States, the antitrust statute of Iowa, and Iowa common law.

19.    This Court has subject matter jurisdiction over JF's claims under 28 U.S.C. §§ 1331 and 1337 as Counts I, II, III, and IV arise under federal statutes—namely the Clayton Act, 15 U.S.C. §§ 15, 26, and the Sherman Act, 15 U.S.C. §§ 1, 2.

20.    This Court has supplemental jurisdiction over JF's state law causes of action under 28 U.S.C. § 1367 because the state law causes of action are so related to the causes of action within the Court's federal question jurisdiction that the state law causes of action form part of the same case or controversy.

21.    This court has personal jurisdiction over Defendants because Seneca is incorporated under Iowa law and because Defendants each have sufficient minimum contacts with Iowa through their anticompetitive conduct aimed at excluding JF from fuel dispenser distribution and servicing in Iowa and attempting to monopolize that market. The court also has personal jurisdiction under 15 U.S.C. § 22.

22.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims herein occurred in this district. Venue is also proper under 15 U.S.C. § 22 because Seneca is an inhabitant of this district and all Defendants may be found in and transact business in this district.

**TRADE AND COMMERCE**

23.    Defendants have sold and continue to sell the products and services at issue in or otherwise relevant to this case—namely, fuel dispensers and related services—in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

24. Defendants' business activities were intended to have and have had a substantial effect on interstate trade and commerce in the United States, including in this judicial district. The acts complained of have and will continue to have substantial effects in this judicial district.

## FACTUAL BACKGROUND

**A. Seneca and OWL Services are horizontal competitors with JF in the Iowa and Southern Illinois market for fuel dispensing system sales and service.**

25. JF supplies fuel and fuel handling systems, and it has been in business for over 78 years. JF constructs, distributes, installs, and services virtually everything that makes up gas stations or convenience stores, including the fuel dispensers (or gas pumps), underground petroleum tanks and equipment, point-of-sales systems, payment systems, and the interior amenities within convenience stores.

26. JF distributes and services fuel dispensers manufactured by Gilbarco to retail and commercial gas stations across the country, including in Iowa and Southern Illinois.

27. JF is a turn-key general contractor licensed in all states and authorized to service Gilbarco equipment, and every other product it sells and installs in all states.

28. JF employs about 600 service technicians.

29. JF has maintained long-standing relationships with hundreds of customers.

30. JF has "branches" or buildings where JF bases employees, inventory, and other resources for a geographic area.

31. Seneca is a leading provider of fueling equipment and support services in the Central United States. It distributes and services fuel dispensers in the Midwest region and previously distributed and serviced fuel dispensers manufactured by Gilbarco in Iowa and Southern Illinois.

32.     Upon information and belief, in early October 2023, Seneca was the third-largest Gilbarco distributor in the country.

33.     Also in early October 2023, Seneca had ████████████████████████████ ████████████████████████████ agreements with Gilbarco.

34.     OWL Services distributes and services fuel dispensers manufactured by Dover Fueling Solutions, which also goes by Wayne ("Wayne"), across the country, including in Iowa and Southern Illinois.  It has 21 offices and employs over 1,500 field service professionals.

35.     OWL Services is the largest Wayne distributor in the country.

36.     OWL Services is a private equity rollup.  In September 2022, Trive and an operating partner formed OWL Services by merging seven recently acquired companies: WildcoPES, CBE, Crompco, e-Structure Solutions, Great Dane Petroleum, JBI Electrical Systems, and Oscar W. Larson Company ("Oscar Larson").

37.     Oscar Larson provided the foundation for OWL Services.  Founded more than 75 years ago, Oscar Larson distributed Wayne fuel dispensers and provided comprehensive fuel-management services in the Midwest.  Trive tapped much of the Oscar Larson management team to run OWL Services and built the rolled-up company on Oscar Larson technology.  Wildco PES was also one of the largest Wayne distributors and service companies operating on the U.S. East Coast.

**B.     Traditionally, distributors in this market (like JF, Seneca, and OWL Services) are aligned with and certified by only one of two major manufacturers: Gilbarco or Wayne.**

38.     Within the petroleum industry, fuel dispensers and related equipment are manufactured primarily by two companies: Gilbarco and Wayne.

39.     Gilbarco and Wayne are fierce competitors and strive to keep their pricing information and other competitively sensitive material out of each other's hands.  On information

and belief, Gilbarco and Wayne do not allow any distributor, such as JF, Seneca, or OWL Services, to be an authorized distributor for the other manufacturer's dispenser line, and Gilbarco and Wayne very rarely authorize a competing distributor to service its dispensing equipment.  In short, distributors and servicers have historically aligned with either Wayne or Gilbarco, but not both. This helps to ensure robust interbrand competition.

40.     When Gilbarco contracts with distributors and servicers, it ensures those contracts contain provisions protecting Gilbarco's proprietary business information, trade secrets, and its monetary investments from being shared with its direct competitor, Wayne.  And it prohibits its distributors from also selling or servicing Wayne fuel dispensers or being affiliated with a distributor or entity with an interest in a competing distributor.

41.     Prior to January 2, 2024, Seneca and JF were both Gilbarco-aligned distributors and each had ASC agreements with overlapping and non-exclusive territories and customers.

42.     Having Gilbarco "distributor" status meant that each company could distribute or sell Gilbarco equipment to customers like gas station and convenience store chains, such as Casey's, HyVee, 7-11, Pilot, Costco, QT, Kwik Trip, and Maverik.

43.     Having Gilbarco ASC status also meant that each company could install, start up, maintain, and service Gilbarco fuel dispensers and other equipment, including the performance of in-warranty work.

44.     Gilbarco's distributor agreement with Seneca contained a change-of-control provision, which provided that ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████

45.    The change-of-control provision in the Seneca-Gilbarco distributor agreement enabled Gilbarco █████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████.

46.    In the petroleum equipment industry, it is common knowledge that both Gilbarco and Wayne include change-of-control provisions in their contracts with distributors in part to ensure that those distributors do not sell their stock or assets to companies (or related entities or affiliates) aligned with the other major manufacturer.

**C.    Together, Seneca, OWL Services, and Trive hatched a plan to be the first brand-agnostic company nationwide.**

47.    In 2023, Seneca decided to offer itself up for sale, and engaged an investment banking firm, D.A. Davidson, to accomplish the acquisition.  At the time, Seneca was one of the largest Gilbarco distributors in the United States and the largest Gilbarco distributor in the Midwest.

48.    ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████

49.    On January 2, 2024, Trive and OWL Services closed their acquisition of Seneca, bringing Seneca and OWL Services—previously head-to-head competitors—under the same corporate ownership.  The price paid for Seneca was indeed above market value.

50.    Although the price paid by OWL for Seneca far exceeded the threshold above which a pre-merger filing under the Hart-Scott-Rodino ("HSR") Act is required, no HSR filing was made.  Under current regulations, the Federal Trade Commission may assess a civil penalty of up to $53,088 for each day of an HSR Act violation.

51.    It was not only federal regulators who were not told about the transaction. Elsewhere, the Defendants also kept the acquisition as quiet as possible.  Neither Trive nor OWL Services issued a press release.  There was no public announcement of the sale of Seneca by Seneca's former owners until August 23, 2024.  And to date, Trive still has not announced the acquisition of Seneca, nor does it list Seneca as one of its portfolio companies.

52.    Elsewhere, others associated with Defendants have likewise failed to disclose the affiliation between Trive and Seneca.  In his conflict-of-interest disclosure form for the Iowa Board of Regents, for instance, former Seneca owner J.C. Risewick has identified his affiliation with Seneca and OWL, but not Trive.  This is a potentially relevant omission given the fact that the University of Iowa Foundation is a limited partner in multiple Trive funds.

53.    Even where the news was shared, the interaction between the companies was downplayed.  Instead of a public announcement, █████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

54.    ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

55.    For instance, ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

56.    Sharing competitively sensitive information softens competition and, as the U.S. Department of Justice noted in its withdrawal of information sharing guidelines in 2023, "risks permitting—even endorsing—frameworks that may lead to higher prices, suppressed wages, or stifled innovation."

57.    Furthermore, Seneca and OWL Services now have an interlocking directorate.

58.    Following the January 2, 2024 acquisition, Seneca now has three directors: Michael Borellis, Blake Bonner, and Howard Armistead.

59.    Michael Borellis also serves as the Chief Financial Officer and Director of Oscar Larson, the company at the center of OWL Services.

60.    Blake Bonner also serves as a Director of an Oscar Larson affiliate, The Oscar Larson NMA Company.

61.    Blake Bonner is a Trive Partner.

62.    Howard Armistead is a Trive Vice President.

63.    On May 1, 2024, J.C. Risewick certified in his Iowa Board of Regents conflict of interest form that he was both an owner of Seneca and a board member at OWL Services.  In

October 2024, this form was amended to delete his ownership interest in Seneca, but to add that he was now a board member and Chief Strategy Officer at a presumably combined entity he called "Seneca/OWL Services."

64.    Thus, with the acquisition, Trive, Seneca, and OWL Services have been completely intermingled, with the latter two gaining access to each other's competitively sensitive information, including the costs of fuel dispensers manufactured by Wayne (through OWL Services) and by Gilbarco (through Seneca).  Such information sharing raises serious competition concerns—a concern that was first acknowledged by OWL's own Greg Ergenbright but that has since been entirely ignored.  Because each manufacturer offers similar terms to its distributors, OWL Services can use its acquisition of Seneca to gain insight into the costs of fuel dispensers paid by its Gilbarco-distributing competitors, such as JF.

65.    This was by design.  With its acquisition of Seneca, Trive sought to turn OWL Services into the only distributor with access to both Wayne and Gilbarco products nationwide and with the ability to service both manufacturers' lines anywhere.  On information and belief, Trive and OWL Services are still pursuing this goal today by seeking to purchase Gilbarco-affiliated distributors in other areas of the country.

**E.    Gilbarco terminates Seneca's contract and scrambles to ensure service coverage in Iowa and Southern Illinois.**

66.    After learning about the acquisition from Seneca, Gilbarco predictably terminated Seneca's contract.  Seneca's sale to a Wayne-affiliated distributor—and the resultant commingling of sensitive pricing information—is the precise reason that Gilbarco had included a change-of-control provision in its contract in the first place and Gilbarco had repeatedly warned Seneca that selling itself to Trive/OWL Services could result in a termination of its ASC status.  The termination was entirely foreseeable to Seneca.

67.    Gilbarco now needed to fill a Seneca-sized hole in Iowa and Southern Illinois.  In January 2024, Gilbarco made the first contact with JF about entering the Iowa and Southern Illinois market, asking JF if it could mobilize its emergency response team and begin servicing Gilbarco's petroleum equipment owned by customers in Iowa and Southern Illinois (*i.e.*, territory where Seneca had a "primary marketing area" or "PMA").

68.    JF informed Gilbarco that it was able to mobilize and serve Gilbarco's customers in Iowa and Southern Illinois.

69.    JF mobilized its emergency response team, as requested, and began providing fuel dispenser servicing to customers in Iowa and Southern Illinois.

70.    A large part of JF's willingness to enter the Iowa and Southern Illinois market was the fact that existing customers of JF were located there, including Casey's, and those customers would be in need of a new Gilbarco-certified distributor now that Seneca had been terminated.  JF expected, in other words, that it would have every opportunity to compete on the merits in Iowa and Southern Illinois and reasonably anticipated that it would earn substantial new business from both new and existing customers.

71.    To date, JF has committed in excess of ██████ toward vehicles and equipment, ██████ in inventory, ██████ in operating expenses, ██████ in expenses related to the deployment of JF's emergency response team, and ██████ in lease commitments, to begin servicing customers in the Iowa and Southern Illinois market.

72.    In total, JF has so far committed at least ██████ to enter into and maintain itself in the Iowa and Southern Illinois market.

**F.    Since JF agreed to expand into Iowa and Southern Illinois, Defendants have done everything in their power to prevent JF from competing on the merits.**

73.    Following JF's entrance into the Iowa and Southern Illinois market for fuel dispenser distribution and servicing, Defendants have acted in concert to impair JF's ability to compete on the merits.

74.    Gilbarco's request that JF enter the Iowa and Southern Illinois market undermined the plans hatched by Seneca, OWL Services, and Trive to become the first brand-agnostic distributor and servicer in the Midwest.  Seneca believed that Gilbarco would have no choice but to maintain its ASC status given the number of convenience stores and gas stations in Iowa and Southern Illinois that needed Gilbarco products and services.  But with a reputable Gilbarco-aligned service provider like JF available to customers, Seneca lost its perceived leverage with Gilbarco.  Thus, Seneca, OWL Services, and Trive have set about undermining JF's ability to compete in an effort to restore that leverage and consolidate market power at the distributor level.

75.    Seneca, OWL Services, and Trive knew that competition from JF would complicate their strategy, and so they employed a three-pronged plan to thwart that competition.

76.    **First**, Seneca has sought to deny JF access to the labor market, baselessly suggesting JF violated a non-solicitation agreement between the parties and aggressively pursuing its own former blue-collar employees in court.

77.    Only two agreements between Seneca and JF contain any sort of non-solicitation obligations, and each is plainly inapplicable.

78.    A since-terminated subcontractor agreement between JF and Seneca included an employee non-solicitation provision.  During the two-year term of this contract and for one year following a termination of employment, ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████ Importantly, the non-solicitation provision contained a carve-out, which expressly stated that JF *may* hire an employee of Seneca ████████████████████████████████████████████ ████████████

79.    In addition, the non-solicitation provision in a confidentiality agreement between JF and Seneca, entered into in connection with JF's contemplated purchase of Seneca, likewise expressly excludes ██████████████████████████████ Seneca employees.

80.    JF published generalized and public posts on LinkedIn regarding job openings for service technicians in Iowa and Southern Illinois. These posts were not targeted at any specific individuals but rather were viewable by anyone who read JF's posts or visited its LinkedIn page. The posts thus plainly constituted ████████████████ posts and ██████████████████ ██████████████████████████ Seneca employees. They thus did not violate either of JF's agreements with Seneca.

81.    Nonetheless, Seneca has baselessly claimed in a separate lawsuit that JF's LinkedIn posts constituted direct solicitations of its employees, which breached the non-solicitation provisions of the agreements, and which constituted various business torts.

82.    Defendants' goal is clear. They have adopted a remarkably broad and unsustainable interpretation of the non-solicitation provisions and sued JF with the hope of tying up its resources and hampering its efforts to expand into a region where Defendants previously enjoyed fewer competitors.

83.    It was not only Seneca that supported this plan. On January 5, 2024, Blake Bonner of Trive sent an email to D.A. Davidson containing a screen shot of ██████████████████████

██████████████████████████    Not long after, Seneca sued JF, baselessly alleging a breach of the confidentiality agreement.

84.    Seneca also set out to ensure that its former employees could not work at other Gilbarco distributors, including JF, locking those employees into noncompete agreements.

85.    The breadth of these noncompete agreements is astonishing. They carry a two-year term and restrict the former hourly employees' ability to find work in their trade within 200 miles of their prior place of employment with Seneca. Prospective employees, often blue-collar service technicians, have no bargaining power in employment negotiations with Seneca. Without bargaining power, prospective employees have no real choice but to accept the noncompete provision as a price for their employment.

86.    Seneca has sought to intimidate its workforce through its unreasonable enforcement of its overbroad noncompete agreements, attempting to secure financially devastating judgments against former hourly employees.

87.    For example, in one such case, Seneca secured a default judgment because the former employee being sued could not afford an attorney and then failed to show up to court. That former employee was ordered to pay over $70,000 while his earnings were approximately $31,000 per year. On information and belief, Seneca had more than ten similar lawsuits pending against former hourly wage workers who have responded to generalized job postings from other employers.

88.    Seneca has entered into and enforced the noncompete agreements to deny its employees the opportunities to seek higher wages elsewhere. Seneca's conduct has also provided an anticompetitive barrier to entry for prospective new market entrants, depriving them fair access to the labor market.

89.    Even more remarkably, Seneca pursued these hourly workers in court *even as Seneca was forced to lay off the workers it <u>did</u> have due to a decrease in its business.*

90.    The plan ultimately backfired.  After receiving negative press coverage of its attempt to stifle worker mobility, Seneca announced in January 2025 that it was no longer enforcing noncompete agreements in their worker contracts.  Seneca's abrupt abandonment of the plan shows that it was never necessary to protect its own interests, as Seneca has claimed, but rather a transparent attempt to build a wall around the Iowa and Southern Illinois market.

91.    ***Second***, Seneca has interfered with and sought to undermine JF's relationship with Gilbarco, falsely telling Gilbarco that █████████████████████████████████ █████████████████████████████ .

92.    When Gilbarco asked JF to enter the Iowa and Southern Illinois market, Seneca, OWL Services, and Trive immediately recognized this threat of increased competition in their territory.  More specifically, Defendants knew that JF's entry posed a threat to Seneca's ability to retain Gilbarco ASC status in Iowa and Southern Illinois.

93.    In an effort to thwart JF's entry into the market, the President and CEO of Seneca, J.C. Risewick, wrote a letter to Gilbarco ████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

94.    Seneca intentionally misrepresented the terms of these contracts in an attempt to convince Gilbarco that JF was not a viable option for Iowa and Southern Illinois.  In fact, JF was not legally prohibited from competing fairly and openly in that market.

95.    In short, Defendants went out of their way to spread falsehoods about JF to Gilbarco with the hope that Gilbarco would abandon its plan to invite JF to enter into and compete in the Iowa and Southern Illinois market.

96.    **Third**, Defendants recruited customers to aid them in their scheme.  Defendants forged an unlawful agreement with Casey's, Iowa's largest convenience store chain and the third largest convenience store chain in the United States, that it would not do business with JF in Iowa or Southern Illinois unless absolutely necessary.

97.    Casey's is a national chain of convenience stores with more than 500 locations in Iowa.  Nationally, Casey's is one of JF's most significant customers, and JF has long provided Casey's with quality fuel equipment servicing and other services across the country.  For instance, in 2021, Casey's engaged JF for a servicing and refurbishment project that involved more than half of Casey's convenience store locations nationwide.  And for an extensive period, JF has also supported network conversions and full IT integrations for stores that Casey's has acquired in other states as they expand across the United States.

98.    After Gilbarco terminated Seneca's ASC credentials, Casey's was without a Gilbarco-certified service technician to service its fuel pump equipment in Iowa and Southern Illinois.  ██████████████████████████████████████████████████ ████████████████████████████  JF is the largest Gilbarco service provider in the nation and one with which Casey's has a long and successful track record.

99.     However, at the urging of Seneca, OWL Services, and Trive, Casey's all but entirely refused to do business with JF Iowa and Southern Illinois during the first five months after JF entered the market, and during the entirety of 2024 the number of service calls Casey's gave JF in Iowa and Southern Illinois paled in comparison to the volume of business JF receives from Casey's elsewhere in the country.

100.    The rate at which Casey's sought service from JF in Iowa and Southern Illinois in those five months and during the entirety of 2024 is orders of magnitude less than what one would expect in a rational and well-functioning market.  Elsewhere in the United States, JF typically receives annual service call volumes from Casey's equivalent to multiple service calls per Casey's location in the state.  For example, in Indiana, there are 143 Casey's locations and JF received ▇ service calls in 2024.  In Ohio, there are 37 Casey's locations and JF received ▇ service calls in 2024.  Yet in Iowa, where there are more than 500 Casey's locations, JF received only ▇ service calls in 2024, and almost none in the first five months after JF entered the market.  In Illinois, where there are also more than 500 Casey's locations, JF received only ▇ service calls during the entirety of 2024.  It is clear that Casey's relied on JF to service its fuel pumps in the relevant market only when absolutely necessary.  This was part of Casey's agreed-upon boycott of JF in furtherance of Defendants' efforts to convince Gilbarco to reinstate Seneca's contract and drive JF out of Iowa.

101.    In addition, after Seneca was terminated by Gilbarco, Casey's was left without a distributor from whom to purchase Gilbarco equipment.  Yet rather than rely on JF—from whom Casey's has long purchased Gilbarco equipment in other markets—Casey's demanded that Gilbarco sell them equipment direct rather than through a distributor.  As a result, JF lost the ability to sell fuel dispensing equipment to Casey's not only in Iowa and Southern Illinois, but nationwide.

102.    Casey's also made a change to its protocol for receiving calls from service technicians. After Seneca was terminated by Gilbarco, Casey's made the decision to have its own in-house technicians become Gilbarco-certified. Casey's requested that Gilbarco train and certify its technicians and Gilbarco asked JF to do so.

103.    Eventually, Casey's realized that buying direct from Gilbarco and self-servicing was not a viable alternative. This about-face from Casey's highlights a few things. It highlights how JF and JF alone provides an important competitive check on Defendants' market power. Boycotting JF, Casey's opted to self-service over using smaller providers. Casey's about-face also highlights the harm to competition resulting from Defendants' scheme. Without JF, customers, particularly large, multi-location ones like Casey's, have no viable alternative to Seneca or OWL Services.

104.    The only plausible explanation for Casey's near refusal to deal with JF is that Seneca, OWL Services, and Trive have secured an unlawful agreement from Casey's to that end.

105.    Strong circumstantial evidence supports the inference of such an agreement.

106.    To begin, J.C. Risewick, the former owner of Seneca and the current Chief Strategy Officer of OWL Services, is a close personal friend of Darren Rebelez, the Chairman and CEO of Casey's.

107.    On February 28, 2024, for instance, J.C. Risewick emailed Darren Rebelez and suggested █████████████████████████████████████████████████████
███████████████████

108.    Defendants' plan is to enlist Casey's—along with other convenience store chains— in its effort to convince Gilbarco not to revoke Seneca's ASC status, or at least to grant it CSC ("customer-specific certification") status to continue servicing Casey's and other specific Gilbarco

customers.   In this way, Defendants intend to further their scheme to extend their market dominance by serving both Wayne and Gilbarco customers in the relevant market.

109.    A November 17, 2023 email from Seneca's investment bankers at D.A. Davidson laid out this plan plainly: █████████████████████████████████████████

███████████████████████

110.    On February 28, 2024—the same day Mr. Risewick met with Mr. Rebelez after ██████████████—Greg Ergenbright of OWL shared with Mr. Risewick █████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

111.    Seneca's customers obliged.  █████████████████████████████

████████████████████████████████████████████████

112.    But Casey's went further than that and actually refrained from sending work to JF in an effort to further support Seneca.

113.    This agreement is reflected in private text messages.  For instance, Jon Hostasa, the head of procurement for Casey's texted Chris Haggard and J.C. Risewick of Seneca, telling them that he █████████████████████████████████████████████████████

███████████████████████

114.    ██████████████████████████████████████████

█████████████████████████████████

115.    While the desire to keep Seneca as a distributor is understandable, Casey's—were it acting in an economically rational manner—should have welcomed the arrival of another Gilbarco-certified service provider to Iowa and Southern Illinois as the increased competition

should translate into lower prices. ████████████████████████████████████

████████████████████████████████████

116.    Casey's also freely provided Seneca with competitively sensitive information, which Seneca shared with OWL Services and Trive even before the sale had been finalized.  In November 2023, for instance, Darren Binning—now Seneca's President and COO—indicated he would ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

117.    Mr. Hostasa also received from Gilbarco a document ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

118.    During this same period, representatives of Seneca (including J.C. Risewick), OWL Services (including Greg Ergenbright), and Trive (including Blake Bonner) ████████

████████████████████████████████████████████████████████

████████████████████████████████████

119.    While Seneca may have a legitimate reason to meet with Casey's as a former customer, there is no legitimate business reason for a representative of Trive, Seneca's private equity owner, to meet with individuals from Casey's—except in furtherance of Defendants' scheme. ████████████████████████████████████████████

████████████████████████████████████

120.    What Seneca, OWL Services, and Trive have been counting on is that Casey's refusal to use JF would put enough pressure on Gilbarco to keep Seneca eligible to perform service

or risk losing Casey's business to Wayne.  Indeed, either outcome would advance Defendants'
monopolistic scheme.  Restoring Seneca's servicing rights would enable Defendants to become
the first brand-agnostic distributor and servicer company—or in Defendants' case, group of
companies.  On the other hand, if Casey's business is shifted to Wayne, Defendants will benefit,
and customers will be harmed from decreased competition and Defendants' enhanced market
power.

121.    As Darren Binning put it in a November 2023 email: ███████████



Seneca, OWL Services, and Trive used JF as a pawn to rachet up the "pain"
on Gilbarco.

123.    In this way, JF—which had an established sales relationship and contractual
relationship with Casey's throughout the country—has lost out on hundreds of potential
opportunities to sell or service Casey's Gilbarco dispensers.

124.    On information and belief, Defendants have also pressured other Gilbarco-affiliated
customers in Iowa and Southern Illinois to boycott JF and refuse to use JF for sales or servicing of
Gilbarco fuel dispensers.

125.    JF invested millions of dollars expanding into Iowa and Southern Illinois, expecting
to compete on the merits and earn the business of longstanding customers like Casey's.  Instead,
JF has faced unlawful obstacles at every turn.

**G.    JF has been injured by the misconduct of Seneca, OWL Services, and Trive.**

126.    Defendants' misconduct has caused, and threatens to cause, substantial injury to JF.

127.    Due to the unlawful agreement among Seneca, OWL Services, Trive, and Casey's not to do business with JF, JF has been deprived of the opportunity to compete on the merits for Casey's service business in Iowa and Southern Illinois, causing JF to lose millions of dollars in sales revenue and profits.

128.    Indeed, JF estimated that Casey's more-than-500 locations in Iowa and 460 locations in Illinois, should have generated substantially more service calls to JF during the five-month boycott period.  But after JF expanded into the Iowa and Southern Illinois market in January 2024 through December of 2024, it received only ▮ total service requests from Casey's in that region, despite the fact that Casey's is one of JF's most significant customers throughout the rest of the country.

129.    And as a result of the unlawful agreement and the pressure placed on Gilbarco by Defendants, Gilbarco made the decision to begin selling fuel pump equipment to Casey's directly, causing JF to lose hundreds of potential sales.

130.    Furthermore, Defendants' anticompetitive conduct has caused JF to suffer irreparable harm to its reputation in the eyes of its customers, its key supplier, and the workforce, and it threatens JF's ability to distribute or service fuel dispensers in Iowa and Southern Illinois at all.

**H.    Relevant Antitrust Market**

131.    The relevant antitrust markets are the Iowa and Southern Illinois markets for fuel dispenser distribution and fuel dispenser servicing. These two product markets are often lumped together and described as a unitary market.

132.    Fuel dispenser distribution and servicing comprises a specialized set of services that require a great deal of investment, expertise, and experience to provide.  Buyers of these services have no reasonable substitutes available, such that a hypothetical monopolist for fuel

dispenser distribution and servicing could profitably raise prices by at least a small but significant amount.

133.    In JF's experience, convenience store and gas station customers have a limited geographic region in which their service providers must be able to respond to service calls quickly and efficiently.  Indeed, ████████████████████████████████████████████ ████████████████ .

134.    The region encompassing Iowa and Southern Illinois is a natural market in which customers may rely on service providers, but outside of which service providers would have a difficult time responding to customer needs in a timely fashion.

135.    Thus, service providers and distributors outside Iowa and Southern Illinois are not reasonable substitutes for service providers and distributors within that geographic region.  Indeed, this is precisely why Gilbarco asked JF to expand into Iowa and Southern Illinois when it terminated Seneca's ASC-status.  It was not a question of JF just beginning to offer services there; JF had to enter that new market.

136.    In addition, fuel retailers must rely for service on a distributor with distribution rights to the territory and a manufacturer authorized service contractor.

137.    Relevant here, Gilbarco awards fuel dispenser distribution rights that cover the entire state or regions of Iowa and Southern Illinois and do not extend beyond that geographical region.  Gilbarco distributors with rights in other regions do not have the right to distribute fuel dispensers into Iowa and Southern Illinois, and fuel retailers may not purchase fuel dispensers from those distributors.  Wayne assigns its distributors regional rights in this same manner.

138.    Customers of fuel dispenser distributors in Iowa and Southern Illinois do not (and cannot) purchase services from distributors from outside that geographic area, or at most do so to

a very limited extent. Similarly, customers from outside Iowa and Southern Illinois do not purchase services from distributors inside that area, or at most do so to a very limited extent.

139.    Therefore, the ability of a hypothetical monopolist in Iowa and Southern Illinois for fuel dispensing equipment to profitably raise price by at least a small but significant amount would not be constrained by competition from distributors serving other regions.

## I.    Together, Seneca and OWL Services have monopoly power.

140.    With the two companies combined, Seneca and OWL gained monopoly power in the relevant market, or at the very least, presented a dangerous probability of achieving such power.

141.    Indeed, Seneca likely had such power on its own prior to the merger. When it put itself up for sale in June 2023, Seneca collaborated with investment banking firm D.A. Davidson to create a Confidential Information Memorandum ("CIM") to distribute to potential buyers.

142.    In the CIM, Seneca bragged about its ███████████████████████ ████████████ estimating that its market share in Illinois was between ███████, while its market share in Iowa was ████████

143.    Seneca also highlighted ██████████████████ that benefitted an entrenched larger player such as itself. ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

144.    Seneca found such a partner in OWL, a competitor that claims to offer distribution, maintenance, and service "across the nation," including in Iowa and Southern Illinois.

145.    The combination with OWL only increased Seneca's market power, further entrenching what had already become a monopoly.

**J.      Competition in the Iowa and Southern Illinois market for fuel dispensing equipment sales and service has been harmed by the efforts to exclude JF.**

146.    Competition in the Iowa and Southern Illinois market for fuel dispensing equipment sales and service has been harmed by the anticompetitive and exclusionary conduct of Seneca, OWL Services, Trive, and Casey's.

147.    Defendants' conduct has deprived JF of the ability to compete on the merits in Iowa and Southern Illinois for sales of products and services to customers of fuel dispensers, for its supplier relationship with Gilbarco, and for employees.

148.    Defendants' conduct has deprived customers within Iowa and Southern Illinois of the benefits of an additional competitor.  Indeed, as Seneca has lost its Gilbarco ASC status, the need for Gilbarco-certified service providers like JF is all the more critical.  Yet Defendants' unlawful conspiracy has prevented JF from growing and from expanding to offer more services to more customers in that region.

149.    What is more, the Defendants' unlawful actions deter new entrants from the market. Other market participants considering expanding into Iowa and Southern Illinois need only look at JF's experience to understand the retaliatory headwinds they will face.  It is reasonable to assume that any participant that attempts to compete in Iowa and Southern Illinois will be on the receiving end of a coordinated campaign by Seneca, OWL, and Trive to undermine that company's relationship with its suppliers, cut it off from access to the labor pool, and persuade critical customers not to do business with it.

150.    As a further result of Defendants' illegal conduct, workers' mobility has been diminished, JF and other purchasers of labor have experienced lower available supply and higher costs, and customers as well as downstream consumers of fuel have lost the benefits of price competition for distribution and servicing of fuel dispensers.

151.    Moreover, Defendants' aim is to exclude JF from the Iowa and Southern Illinois market for distribution and servicing of fuel dispensers entirely, thereby concentrating the market and decreasing competition.  In particular, Defendants seek to hamstring JF's ability to compete on the merits in the region, thereby forcing Gilbarco to restore Seneca's ASC status and completing Defendants' scheme to monopolize the relevant market by becoming the first brand-agnostic fuel pump distributor and servicer in the region and nationwide.  Unless Defendants' anticompetitive conduct is put to an end, there is a dangerous probability that Defendants will achieve their goal.

## CAUSES OF ACTION

### COUNT I: Monopolization in Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) against All Defendants

152.    JF expressly incorporates its allegations in the foregoing paragraphs as if fully stated herein.

153.    Seneca, OWL Services, and Trive have pursued a multi-pronged scheme specifically intended to insulate and entrench their monopoly in the Iowa and Southern Illinois market for fuel dispenser distribution and servicing.  This intent is reflected in Trive's roll-up of competing distributors, its payment above market value for Seneca, Defendants' concealment of their common ownership and interlocking directorates, their broken promises to protect and not share competitively sensitive information, and their targeting of their primary competitor, JF, through anticompetitive activities relating to its customers, its supply of labor, and its key supplier Gilbarco.

154.    Gilbarco and Wayne control the large majority of the upstream market.  Although Gilbarco and Wayne compete vigorously at the supplier level, and take steps to protect their confidential competitive information, Defendants' scheme would significantly diminish or destroy

that competitive dynamic and allow Defendants to exercise market power as the dominant distributor and servicer for both suppliers.

155.    Despite their promises to erect firewalls, Seneca and OWL Services have access to each other's competitively sensitive information through an unlawful interlocking directorate and common ownership under Trive.  Defendants' unlawful information sharing is already occurring and will only increase as their monopoly is strengthened and the Defendants gain even greater access to both competitively sensitive information about Gilbarco (through Seneca) and Wayne (through OWL Services).

156.    Defendants' anticompetitive activities extend far beyond unlawful information sharing and include exclusionary conduct calculated to impair competitors' access to customers, labor, and suppliers and ultimately to maintain Defendants' monopoly.  At the customer level, Defendants have orchestrated a customer boycott led by Casey's, the largest convenience store chain in the Midwest, to deny JF access to customers in Iowa and Southern Illinois.

157.    At the labor level, Defendants have unreasonably entered into and enforced overbroad noncompete provisions in employment agreements with former employees of Seneca to deny JF access to experienced labor in Iowa and Southern Illinois.  Abusing noncompete provisions raises rivals' labor costs, impairing their ability to compete.

158.    At the supplier level, Defendants have mispresented to Gilbarco that ████████ ████████████████████████████████████████████████████████████████████ ██████ .

159.    Defendants have monopoly power in this market—by their own admission, their market share is north of ████ .  High barriers to entry also exist.  Even a large and successful company like JF had to undertake significant expense and effort to expand into Iowa and Southern

Illinois; a potential competitor entering the market from scratch would have to surmount even greater obstacles, including achieving certification from either Gilbarco or Wayne to perform in-warranty service work. High barriers to entry make successful and timely entry from competitors unlikely, weakening competitive constraints on Defendants. Finally, even if not successful in getting Seneca's ASC status reinstated, Defendants will be able to capitalize on the disruption to Gilbarco's distribution in the relevant market to entrench and enhance their market power by shifting customers' business in the market to Wayne, for which Defendants serve as the dominant distributors and servicers.

160.    Defendants' conduct has caused substantial anticompetitive effects, detailed above, in the Iowa and Southern Illinois market for fuel distribution and servicing. There are no non-pretextual procompetitive benefits stemming from Defendants' conduct that are sufficient to outweigh those anticompetitive effects.

161.    Defendants' conduct has damaged, and threatens to damage, JF, as detailed above.

162.    JF seeks both treble damages and injunctive relief to remedy Defendants' antitrust violations, as detailed below in JF's prayer for relief.

**COUNT II: Attempted Monopolization in Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) against All Defendants**

163.    JF expressly incorporates its allegations in the foregoing paragraphs as if fully stated herein.

164.    Seneca, OWL Services, and Trive have pursued a multi-pronged scheme specifically intended to monopolize the Iowa and Southern Illinois market for fuel dispenser distribution and servicing. This intent is reflected in Trive's roll-up of competing distributors, its payment above market value for Seneca, Defendants' concealment of their common ownership and interlocking directorates, their broken promises to protect and not share competitively

sensitive information, and their targeting of their primary competitor JF through anticompetitive activities relating to its customers, its supply of labor, and its key supplier Gilbarco.

165.    Gilbarco and Wayne control the large majority of the upstream market.  Although Gilbarco and Wayne compete vigorously at the supplier level, and take steps to protect their confidential competitive information, Defendants' scheme would significantly diminish or destroy that competitive dynamic and allow Defendants to exercise market power as the dominant distributor and servicer for both suppliers.

166.    Despite their promises to erect firewalls, Seneca and OWL Services have access to each other's competitively sensitive information through an unlawful interlocking directorate and common ownership under Trive.  Defendants' unlawful information sharing is already occurring and would increase if their monopolization scheme is successful because Defendants would have even greater access to both competitively sensitive information about Gilbarco (through Seneca) and Wayne (through OWL Services).

167.    Defendants' anticompetitive activities extend far beyond unlawful information sharing and include exclusionary conduct calculated to impair competitors' access to customers, labor, and suppliers.  At the customer level, Defendants have orchestrated a customer boycott led by Casey's, the largest convenience store chain in the Midwest, to deny JF access to customers in Iowa and Southern Illinois.

168.    At the labor level, Defendants have unreasonably entered into and enforced overbroad noncompete provisions in employment agreements with former employees of Seneca to deny JF access to experienced labor in Iowa and Southern Illinois.  Abusing noncompete provisions raises rivals' labor costs, impairing their ability to compete.

169.    At the supplier level, Defendants have mispresented to Gilbarco that ███████

████████████████████████████████████████████████████████████████████

███████ .

170.    Defendants have a dangerous probability of succeeding in monopolizing the Iowa and Southern Illinois market for fuel dispenser distribution and servicing.  Defendants have a dominant share of this market.  JF, the primary competitor standing in Defendants' way, has already been weakened, and Defendants' conduct threatens JF's ability to compete in the relevant market altogether.  High barriers to entry also exist.  Even a large and successful company like JF had to undertake significant expense and effort to expand into Iowa and Southern Illinois; a potential competitor entering the market from scratch would have to surmount even greater obstacles, including achieving certification from either Gilbarco or Wayne to perform in-warranty service work.  High barriers to entry make successful and timely entry from competitors unlikely, weakening competitive constraints on Defendants.  Finally, even if not successful in getting Seneca's ASC status reinstated, Defendants will be able to capitalize on the disruption to Gilbarco's distribution in the relevant market to entrench and enhance their market power by shifting customers' business in the market to Wayne, for which Defendants serve as the dominant distributors and servicers.

171.    Defendants' conduct has caused substantial anticompetitive effects, detailed above, in the Iowa and Southern Illinois market for fuel distribution and servicing.  There are no non-pretextual procompetitive benefits stemming from Defendants' conduct that are sufficient to outweigh those anticompetitive effects.

172.    Defendants' conduct has damaged, and threatens to damage, JF, as detailed above.

173.    JF seeks both treble damages and injunctive relief to remedy Defendants' antitrust violations, as detailed below in JF's prayer for relief.

**COUNT III: Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) against All Defendants**

174.    JF expressly incorporates its allegations in the foregoing paragraphs as if fully stated herein.

175.    Seneca, OWL Services, and Trive have conspired and agreed with one another and with at least one customer (Casey's) to pursue a multi-pronged scheme specifically intended to monopolize the Iowa and Southern Illinois market for fuel dispenser distribution and servicing. This intent is reflected in Trive's roll-up of competing distributors, its payment above market value for Seneca, Defendants' concealment of their common ownership and interlocking directorates, their broken promises to protect and not share competitively sensitive information, and their targeting of their primary competitor JF through anticompetitive activities relating to its customers, its supply of labor, and its key supplier Gilbarco.

176.    Gilbarco and Wayne control the large majority of the upstream market.  Although Gilbarco and Wayne compete vigorously at the supplier level, and take steps to protect their confidential competitive information, Defendants' scheme would significantly diminish or destroy that competitive dynamic and allow Defendants to exercise market power as the dominant distributor and servicer for both suppliers.

177.    Despite their promises to erect firewalls, Seneca and OWL Services have access to each other's competitively sensitive information through an unlawful interlocking directorate and common ownership under Trive.  Defendants' firewalls have also proved ineffective because Seneca has shared competitively sensitive information obtained from Casey's with OWL Services and Trive.  Defendants' unlawful information sharing is already occurring and would increase if

their monopolization scheme is successful because Defendants would have even greater access to both competitively sensitive information about Gilbarco (through Seneca) and Wayne (through OWL Services).

178.    In addition to Defendants' unlawful information sharing, Defendants' overt acts in furtherance of their conspiracy to monopolize the relevant market have included anticompetitive, exclusionary conduct calculated to impair competitors' access to customers, labor, and suppliers. At the customer level, Defendants have conspired with one another and taken actions to deny JF access to customers in Iowa and Southern Illinois by orchestrating a customer boycott led by Casey's, the largest convenience store chain in the Midwest.

179.    At the labor level, Defendants have conspired with one another and taken actions to deny JF access to experienced labor in Iowa and Southern Illinois by unreasonably enforcing overbroad noncompete provisions in employment agreements with former employees of Seneca. Abusing noncompete provisions raises rivals' labor costs, impairing their ability to compete.

180.    At the supplier level, Defendants have conspired with one another and taken actions to undermine JF's relationship with Gilbarco by ███████████████████████████████ ████████████████████████████████.

181.    Defendants have a dangerous probability of succeeding in monopolizing the Iowa and Southern Illinois market for fuel dispenser distribution and servicing.  Defendants have a dominant share of this market. JF, the chief competitor standing in the way, has already been weakened, and Defendants' conduct threatens JF's ability to compete in the relevant market altogether.  High barriers to entry also exist.  Even a large and successful company like JF had to undertake significant expense and effort to expand into Iowa and Southern Illinois; a potential competitor entering the relevant market from scratch would have to surmount even greater

obstacles.  High barriers to entry make successful and timely entry from competitors unlikely, weakening competitive constraints on Defendants. Finally, even if not successful in getting Seneca's ASC status reinstated, Defendants will be able to capitalize on the disruption to Gilbarco's distribution in the relevant market by shifting customers' business in the market to Wayne, for which Defendants serve as the dominant distributors and servicers.

182.    Defendants' conduct has caused significant anticompetitive effects, detailed above, on a substantial amount of interstate commerce including in the Iowa and Southern Illinois market for fuel distribution and servicing.  There are no non-pretextual procompetitive benefits stemming from Defendants' conduct that are sufficient to outweigh those anticompetitive effects.

183.    Defendants' conduct has damaged, and threatens to damage, JF, as detailed above.

184.    JF seeks both treble damages and injunctive relief to remedy Defendants' antitrust violations, as detailed below in JF's prayer for relief.

185.    Defendants should be estopped from arguing that they are controlled by a single center of economic decision-making (and therefore unable to conspire with another) as they have held themselves out as operating independently so as to avoid competitive concerns.  In other words, Defendants cannot in the same breath claim to be erecting firewalls to prevent collusion and incapable of colluding in the first place.

**COUNT IV: Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) against All Defendants**

186.    JF expressly incorporates its allegations in the foregoing paragraphs as if fully stated herein.

187.    Seneca, OWL Services, and Trive pursued a multi-pronged scheme to drive JF out of the Iowa and Southern Illinois market for fuel dispenser distribution and servicing.

188.   First, Defendants entered into an unlawful conspiracy including each of the Defendants and Casey's, the leading customer of fuel dispensers and related services in Iowa and Southern Illinois, pursuant to which Casey's has agreed with Defendants that it will all but entirely boycott JF in Iowa and Southern Illinois.

189.   Second, Defendants have conspired with one another and taken actions to deny JF access to experienced labor in Iowa and Southern Illinois by unreasonably enforcing overbroad noncompete provisions in employment agreements with former employees of Seneca.

190.   Third, Defendants have conspired with one another and taken actions to undermine JF's relationship with Gilbarco, ███████████████████████████████████████ ████████████████ .

191.   These agreements constituted naked restraints of trade, having no purpose other than disadvantaging JF and stifling competition.  The agreements were not intended to enhance efficiency or competition in the Iowa and Southern Illinois market for fuel dispenser distribution and servicing, nor have they in fact done so.

192.   The agreements have impaired JF's access to customers, the workforce, and its supplier, each of which are vital to enable JF to compete for fuel dispenser distribution and servicing in Iowa and Southern Illinois.

193.   Defendants' conduct has caused substantial anticompetitive effects, detailed herein, in the Iowa and Southern Illinois market for fuel distribution and servicing.  There are no non-pretextual procompetitive benefits stemming from Defendants' conduct that are sufficient to outweigh those anticompetitive effects.

194.   Defendants' conduct has damaged, and threatens to damage, JF, as detailed above.

195.    JF seeks both treble damages and injunctive relief to remedy Defendants' antitrust violations, as detailed below in JF's prayer for relief.

196.    Defendants should be estopped from arguing that they are controlled by a single center of economic decision-making (and therefore unable to conspire with another) as they have held themselves out as operating independently so as to avoid competitive concerns.  In other words, Defendants cannot in the same breath claim to be erecting firewalls to prevent collusion and incapable of colluding in the first place.

**COUNT V: Conspiracy to Restrain and Monopolize Trade in Violation of Iowa Competition Law (Iowa Code § 553.4) against All Defendants**

197.    JF expressly incorporates its allegations in the foregoing paragraphs as if fully stated herein.

198.    Seneca, OWL Services, and Trive pursued a multi-pronged scheme to drive JF out of the Iowa and Southern Illinois market for fuel dispenser distribution and servicing.

199.    First, Defendants entered into an unlawful conspiracy including each of the Defendants and Casey's, the leading customer of fuel dispensers and related services in Iowa and Southern Illinois, pursuant to which Casey's has agreed with Defendants that it will all but entirely boycott JF in Iowa and Southern Illinois.

200.    Second, Defendants have conspired with one another and taken actions to deny JF access to experienced labor in Iowa and Southern Illinois by unreasonably enforcing overbroad noncompete provisions in employment agreements with former employees of Seneca.

201.    Third, Defendants have conspired with one another and taken actions to undermine JF's relationship with Gilbarco, ███████████████████████████████████ ████████████████████████████████████████.

202.    These agreements constituted naked restraints of trade, having no purpose other than disadvantaging JF and stifling competition.  The agreements were not intended to enhance efficiency or competition in the Iowa and Southern Illinois market for fuel dispenser distribution and servicing, nor have they in fact done so.

203.    The agreements have impeded JF's access to customers, the workforce, and its supplier, each of which are vital to enable JF to compete for fuel dispenser distribution and servicing in Iowa and Southern Illinois.

204.    Defendants collectively possess a dominant position in the Iowa and Southern Illinois market for fuel distribution and servicing.

205.    Defendants' conduct has caused substantial anticompetitive effects, detailed herein, in the Iowa and Southern Illinois market for fuel distribution and servicing.  There are no non-pretextual procompetitive benefits stemming from Defendants' conduct that are sufficient to outweigh those anticompetitive effects.

206.    Defendants' conduct has damaged, and threatens to damage, JF, as detailed above.

207.    JF seeks both treble damages and injunctive relief to remedy Defendants' antitrust violations, as detailed below in JF's prayer for relief.

208.    Defendants should be estopped from arguing that they are controlled by a single center of economic decision-making (and therefore unable to conspire with another) as they have held themselves out as operating independently so as to avoid competitive concerns.  In other words, Defendants cannot in the same breath claim to be erecting firewalls to prevent collusion and incapable of colluding in the first place.

**COUNT VI: Monopolization and Attempted Monopolization in Violation of Iowa Competition Law (Iowa Code § 553.5) against All Defendants**

209.    JF expressly incorporates its allegations in the foregoing paragraphs as if fully stated herein.

210.    JF expressly incorporates its allegations in the foregoing paragraphs as if fully stated herein.

211.    Seneca, OWL Services, and Trive have pursued a multi-pronged scheme specifically intended to monopolize the Iowa and Southern Illinois market for fuel dispenser distribution and servicing.  This intent is reflected in Trive's roll-up of competing distributors, its payment above market value for Seneca, Defendants' concealment of their common ownership and interlocking directorates, their broken promises to protect and not share competitively sensitive information, and their targeting of their primary competitor JF through anticompetitive activities relating to its customers, its supply of labor, and its key supplier Gilbarco.

212.    Gilbarco and Wayne control the large majority of the upstream market.  Although Gilbarco and Wayne compete vigorously at the supplier level, and take steps to protect their confidential competitive information, Defendants' scheme would significantly diminish or destroy that competitive dynamic and allow Defendants to exercise market power as the dominant distributor and servicer for both suppliers.

213.    Despite their promises to erect firewalls, Seneca and OWL Services have access to each other's competitively sensitive information through an unlawful interlocking directorate and common ownership under Trive.  Defendants' firewalls have also proved ineffective because Seneca has shared competitively sensitive information obtained from Casey's with OWL Services and Trive.  Defendants' unlawful information sharing is already occurring and would increase if their monopolization scheme is successful because Defendants would have even greater access to

both competitively sensitive information about Gilbarco (through Seneca) and Wayne (through OWL Services).

214.    Defendants' anticompetitive activities extend far beyond unlawful information sharing and include exclusionary conduct calculated to impair competitors' access to customers, labor, and suppliers.  At the customer level, Defendants have orchestrated a customer boycott led by Casey's, the largest convenience store chain in the Midwest, to deny JF access to customers in Iowa and Southern Illinois.

215.    At the labor level, Defendants have unreasonably enforced overbroad noncompete provisions in employment agreements with former employees of Seneca to deny JF access to experienced labor in Iowa and Southern Illinois.  Abusing noncompete provisions raises rivals' labor costs, impairing their ability to compete.

216.    At the supplier level, Defendants have mispresented to Gilbarco that ███████████
████████████████████████████████████████████████████████████████████████
███████ .

217.    Defendants have a dangerous probability of succeeding in monopolizing the Iowa and Southern Illinois market for fuel dispenser distribution and servicing.  Defendants have a dominant share of this market.  JF, the primary competitor standing in Defendants' way, has already been weakened, and Defendants' conduct threatens JF's ability to compete in the relevant market altogether.  High barriers to entry also exist.  Even a large and successful company like JF had to undertake significant expense and effort to expand into Iowa and Southern Illinois; a potential competitor entering the market from scratch would have to surmount even greater obstacles.  High barriers to entry make successful and timely entry from competitors unlikely, weakening competitive constraints on Defendants.  Finally, even if not successful in getting

Seneca's ASC status reinstated, Defendants will be able to capitalize on the disruption to Gilbarco's distribution in the relevant market to entrench and enhance their market power by shifting customers' business in the market to Wayne, for which Defendants serve as the dominant distributors and servicers.

218.    Defendants' conduct has caused substantial anticompetitive effects, detailed above, in the Iowa and Southern Illinois market for fuel distribution and servicing.  There are no non-pretextual procompetitive benefits stemming from Defendants' conduct that are sufficient to outweigh those anticompetitive effects.

219.    Defendants' conduct has damaged, and threatens to damage, JF, as detailed above.

220.    JF seeks both treble damages and injunctive relief to remedy Defendants' antitrust violations, as detailed below in JF's prayer for relief.

**COUNT VII: Tortious Interference with Prospective Business Relationships in Violation of Iowa Common Law against All Defendants**

221.    JF expressly incorporates its allegations in the foregoing paragraphs as if fully stated herein.

222.    At the time JF entered the Iowa and Southern Illinois market, it had a prospective contractual or business relationship with Casey's in that region. Nationally, Casey's is one of JF's biggest customers, and JF has long provided Casey's with quality fuel equipment servicing and sales across the country. In addition, after Seneca was no longer authorized to service in-warranty Gilbarco equipment, Casey's was without a Gilbarco-certified service technician to service its fuel pump equipment in Iowa and Southern Illinois, and Gilbarco encouraged Casey's to obtain servicing from JF in the region. JF thus invested millions of dollars expanding into Iowa and Southern Illinois with the expectation that it could compete on the merits to distribute and service fuel dispensers to Casey's.

223.    Defendants were well aware of JF's prospective contractual or business relationship with Casey's in Iowa and Southern Illinois; indeed, Defendants specifically pressured Casey's to agree to all but entirely refuse to do business with JF in the region.

224.    Defendant intentionally and improperly interfered with JF's prospective contractual or business relationship with Casey's in Iowa and Southern Illinois. In particular, Defendants entered into an unlawful agreement with Casey's, detailed above, that it would not engage JF for fuel equipment servicing in the region unless absolutely necessary and that it would not buy new Gilbarco fuel dispensers from JF (or any other distributor besides Seneca).  Defendants' interference was unjustified and improper, and it was intended to financially harm JF and prevent it from competing in the Iowa and Southern Illinois market.

225.    As a proximate and foreseeable result of Defendants' tortious interference, JF has been deprived of the opportunity to compete on the merits to sell and service fuel pump equipment to Casey's in Iowa and Southern Illinois, causing JF to lose millions of dollars in sales revenue and profits. Absent Defendants' tortious interference, JF would have received hundreds (if not more) additional service calls from Casey's in Iowa and Illinois.  In addition, as a proximate and foreseeable result of Defendants' tortious interference with JF's prospective contractual or business relationship, Gilbarco made the decision to begin selling fuel pump equipment to Casey's directly, causing JF to lose hundreds of potential sales to Caseys.

226.    JF seeks damages for the costs stemming from Defendants' tortious interference with JF's prospective contractual or business relationship with Casey's in Iowa and Southern Illinois.

## PRAYER FOR RELIEF

WHEREFORE, JF Acquisition, LLC respectfully requests that the Court enter judgment

in its favor and against Defendants on all claims asserted herein for:

    a.      Actual damages in an amount to be determined at trial;

    b.      Treble damages;

    c.      Reasonable attorneys' fees and costs;

    d.      Permanent injunctive relief in the form of an order:

        i.    Declaring that Seneca, OWL Services, and Trive have violated Sections 1 and 2 of the Sherman Act, as well as the corresponding provisions of the Iowa Competition Law;

        ii.    Enjoining Seneca, OWL Services, and Trive from further acts in support of their conspiracy and attempt to restrain and monopolize trade; and

    e.      Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

JF Acquisition, LLC demands a trial by jury for all issues so triable.


Date: March 24, 2025

                */s/ Teresa B. Morio*
                SAMUEL E. JONES      AT0009821
                TERESA B. MORIO      AT0000755
                JACKSON C. BLAIS      AT0014222
                SHUTTLEWORTH & INGERSOLL, PLC
                235 6th Street SE
                PO Box 2107
                Cedar Rapids, IA 52406-2107
                Phone: (319)-365-9461
                Fax: (319)-365-8443
                Email: sej@shuttleworthlaw.com
                       tbm@shuttleworthlaw.com
                       jcb@shuttleworthlaw.com

                and

                NICHOLAS J. GILES *pro hac vice motion to be filed*
                ANDREW E. TALBOT *pro hac vice motion to be filed*

GEORGE E. RUDEBUSCH *pro hac vice*
*motion to be filed*
MCGUIREWOODS LLP
Gateway Plaza, 800 E. Canal Street
Richmond, VA 23219
Phone: (804) 775-4760
Email:  ngiles@mcguirewoods.com
        atalbot@mcguirewoods.com
        grudebusch@mcguirewoods.com

ATTORNEYS FOR PLAINTIFF
JF ACQUISITION, LLC